Mr. Aldrich. Good morning, Your Honor. Jason Aldrich on behalf of Petitioner. May it please the Court. This case is here before you because we found it unacceptable for a federal employee to lose her career of almost 20 years based upon the facts of this case. And I wanted to take the time this morning to direct your attention to two aspects. And first, under the substantial evidence standard, the conduct that they alleged from the get-go in the proposal notice does not amount to misconduct at all. And there were essentially three allegations contained in that paragraph, which I believe you can find in the appendix at, I believe it was page 54. And it's that first paragraph under appropriate association, which boiled down to that she had a negative attitude while interacting with an airport police officer, trying to convince him to arrest an illegal alien that they had in their custody on state charges for possession of a federal... Let me ask you a housekeeping question. Absolutely, sir. The government construes part of your opening brief as making an impermissibly vague argument. And you say in your reply that it's substantial evidence, question only. Yes, absolutely. We're correct on that. Yeah, and what I really was trying to clarify there, Your Honor, was that this conduct that they say is misconduct is not misconduct at all. And that's where this vagueness comes in. And that is, how can you say that encouraging a state officer to do the very same act that one of her peers at another station does routinely, which you testified to in this case, it promotes the efficiency of the service and promotes their agency mission. And then that number two, which I harked on in my brief, is just denying that you know somebody somehow amounts to misconduct. And then this third allegation that she made this comment, which she denied in the record, which the arbitrator found that he didn't believe on that. Those are evidence. I understand that, Your Honor. But there's so much about this case where you can question that. And I understood that under Conant that you may want to defer to the arbitrator on those evidentiary findings. But there's so much about that that I think the arbitrator completely ignored. He didn't focus on how this allegation came about. He didn't focus on Officer Spikes, this airport police officer. How he said the recruit who was present with him was so impressionable, but yet this recruit had 27 years law enforcement experience. And there was so much doubt there about that officer's credibility that it just raised some red flags. I understood under Conant that that could be difficult for this court to accept. So I also wanted to focus you on the second aspect, which is the penalty of removal says, by a federal agency, that we don't trust you to do this job anymore. That's the only thing it says. This is not the first time. For her disciplinary action, correct. And that's why we cited at the arbitration hearing to Madison v. Department of the Air Force, where an employee there who continued to perform a full range of her duties. Your argument is that if they were that worried about this employee, they should have taken her off the job site, not kept her around, used her, and paid her. It's in the agency. I know there's evidence before the court, but that's something that the agency routinely does is they put them on paid administrative duties, pull their badge and gun, and assign them to duties that have nothing to do with law enforcement. But here, they assigned her to do the very same thing, which they allege we couldn't trust you to do anymore. And that was interact with municipal law enforcement officers at the marinas, in the county, the city. If she was so untrustworthy, then how do you allow her to go badge, gun, uniform, out in the community, interacting with not only other law enforcement officers? I mean, isn't the answer there are degrees of untrustworthiness and offsetting possible needs of the agency? And I mean, is it not within the agency's reasonable discretion about penalty to say there are five or six of these pretty unpleasant incidents? We don't want them to continue indefinitely. We don't think you're so worrisome to us that we need to make sure that from today going forward, you're not dealing with anybody, but we're not going to put up with this any longer. I think there would be credibility for that position if they didn't allow her to do this full range of duties for 10 months. They knew about the allegation. They had it investigated and concluded pretty quickly. And even after she was proposed termination, I think it was a three or four month time span that she continued to do this whole range of duties. And when she presented her oral reply to the chief patrol agent, the deciding officer. Would it be legitimate to terminate her just because they think she's nasty to people? I mean, you have to think about the law enforcement officer. It's not dangerous. It's just that she's nasty. I don't think that's legitimate at all. And part of this is that she's a border patrol agent. The whole nature of her job, there's an animosity to it, and then you have state officers. The immigration topic is a hot topic, but when you're dealing with another law enforcement officer. The immigration topic? You're saying that the nature of a law enforcement officer's job is to be aggressive to the public? I don't think she was accused of being aggressive here, and that's certainly not what I'm saying, Your Honor. I'm just saying is that when you're in an enforcement position, the person on the receiving end of that is not always going to be receptive to it. The assertion of authority, that's the whole nature of the Fourth Amendment. What I am saying here is that in this particular circumstance, it was behind closed doors with only other law enforcement officers trying to convince these state officers to make an enforcement action, and it didn't take. And after she called her supervisor and said, this is my situation, her supervisor said, bring them on in. And that's exactly what she did. And this whole thing came about not because that airport police officer made a phone call or filed a complaint. It was a public survey by her supervisor the very next day. But for that phone call by him, which I saw that as a fishing expedition, this thing would never be before the court. So again, it comes down to, was this misconduct at all? Just this verbal exchange, which really never got loud according to the testimony. It was this request for enforcement action that the state officer was reluctant to take. And then these couple other comments, I don't know this person. People are harping on me at work, that that's somehow after 20 years of service as a Border Patrol agent, that she should lose her career over that. And I recognize the prior disciplinary action. I understood going into this case. Well, the arbitrator said that the events in question at the Jacksonville airport alone would not have been enough for him to sustain the penalty. Yes, he did say that. He said that's not enough. But he said it's the connection with all the prior events that led him to believe that the agency had successfully passed through the Douglas factors and found the adverse effect on the surface. My counter to that is it's based upon a subjective interpretation of another police officer in terms of negative attitude. If you separate the two things, I mean, the event at the airport is thin. But it happened. And you have a state officer who seemed to be concerned enough that the interrelationship with your client on that day was going to lead to some further discussion with somebody. That's what he said. That's why I called up. Because in essence, I was afraid she'd report me. Yes, he did testify. So he said something went on out there that maybe it's because they had some knowledge about your client or they were worried about her because she, you know, made a little trouble. To clarify, your honor, that call that he made was to his supervisors only. No call was made to DHS or CBP about them. It was only, I believe his testimony was he was covering himself by making that phone call in case something came up. And didn't his supervisor say, well, you better write something up? I don't recall that testimony, but it could be there. You might be correct. Yeah, I mean, so your concern, you want to cover your, you know, you write up what your view of the episode was and send it in. That's what he did. And then things went on from there. Yeah, there was the phone call by her supervisor. It was an acting patrol agent in charge of the station who called the airport police the next day to say, how did our employee do? Why was he calling? That's the big question. And that's, I don't know. Maybe he got a call from the state guy's supervisor. Something went on over there. No, no, that's not what he testified. Agent Martinez testified that it was his initiative. He received no information prior that prompted him, no information from airport police that prompted him to make that phone call. It was. He was calling up to say, how'd my agent do out there? Correct. And he testified clearly. And I believe the arbitration transcript, which that portion is not lodged in the record, but we get to that if you like, was very clear that no. Substantial evidence supports the conclusion that whatever happened at the airport went down according to the testimony of the state officer. And my response to that is upsetting to me and upsetting to my colleagues. That was his testimony. And then a colleague who the state officer out there at the airport said, well, this is my, you know, my scrub, my new person. And he said, well, new shmoo, he's been on the service for 20 years. But then the officer at the airport came back and said, well, he's new out to the airport. Yes. But when you read his declaration, which I believe is in the appendix. I read it last night. He said he was new at the airport. New at the airport. And that's that's not what his when you read his declaration, you get that distinct impression that this was some new young 20 year old person coming into law enforcement. And I just don't. He says he's new at the airport. I don't I don't want him to think this is how things happen out at the airport. All this haggling back and forth about who's supposed to take the suspect into custody, state or fed. I think that's what he tried to lead the arbitrator to believe in his testimony. And I, me personally, I didn't. I mean, that was wasn't that the gist of what was going on at the airport was there was a dispute between your client and the state person. Right. Who was going to who was going to have to take all the terrible effort to write this guy up? And a fellow who who had false identity or done something that raised suspicion about him. And again, I focus on what he has to take a lot of trouble to go write it up. I focus on the conduct and what her conduct is there as to that first allegation about the negative attitude and reluctance to take a person into custody. Her colleague, Agent Mattesian, testified he does the same thing. So when we focus on the conduct, it's like, well, the person that she's expressing this desire to to have state enforcement on this charge, it's the same conduct that this other agent does. But yet somehow her conduct is perceived as negative attitude. And that's the double standard that I had a real. Officer said it was the first time he'd ever had anybody say it to him. Officer Spikes said that. That might have been what he testified to. But I mean, with I think he had over 20 years law enforcement experience. I personally have trouble accepting that, but it's and I don't know how often they come into contact with persons who are in the country illegally at the Jacksonville Airport. It's very far north point of entry. And this person was trying to get on the plane, the person that was in custody to try to go back to Guatemala with the ticket that he purchased himself. Again, I focus on the conduct. What Agent Dixon here is exactly the same as what another agent did. But yet she had the misfortune of having someone perceive her as negative attitude. You're under your rebuttal time, but you can keep going. I will reserve the three minutes for rebuttal. Thank you. Thank you. May I please the quote? If I can pick up on one point you were making, Judge Klavenger. The reason that Agent Dixon's supervisor was calling was he testified that was his routine practice to do so because it was important to maintain relationships with local law enforcement. This misconduct was that she was trying not to perform one of the essential functions of her job, which is to take aliens into custody. Moreover, she did so in a manner that had the potential to damage relationships. Is it her job to take someone into custody if the state official expresses its desire to take the person into custody on a state charge? Well, no. She doesn't. Well, let me ask this question. Was there a pre-existing policy here at this airport and this area that the feds always took jurisdiction and the feds did the charging? No, but she was directed by her supervisor to go pick up the alien. She was not told to go and negotiate whether there were state charges. Her job was to go and pick up the agent. It was up to Officer Spikes in the exercise of his discretion to determine whether or not a state charge was appropriate. That was not Agent Dixon's job. She was there merely to pick him up. She was ordered by her boss to go out to the airport and take this guy into federal custody and bring him down to booking? Basically, yes, Your Honor. So why do we give a darn what the state person said? That's a supremacy clause. When the federal government said we want someone, why was there any ground for the state officer to express his judgment one way or the other? Because she told, she asked him to take him into state custody on state charges and he said he didn't think that was appropriate. She's not being charged with violating instructions. She's being charged with being reluctant to perform her duties by taking the alien into custody because she ultimately did take him into custody. That's why she wasn't charged with not following instructions. But to get her to do that, even after he had said he wasn't going to take her into custody, he had to repeatedly tell her that. Reluctance to obey orders. I guess you could charge that. That's not what's written up here. It's reluctant to take an alien into custody. And that's her job function. And it was also disparaging her coworkers. So the charge was that because she ultimately did take him into custody. That's one of the charges. The decision here was made that she made three mistakes. Second mistake was that she said, I never worked with Judge Toronto when we were in private practice. That's what she said. She said, I never worked with that person. Right? Well, officers. That's what she said. Those were her words. So how is the fact that I never worked with somebody inappropriate conduct? Because she used, she said it abruptly and in a rude tone as Officer Spikes testified. Now where's the rude? Where's the testimony that it was rude? It was abrupt. I didn't see the charge said it was rude.  He found the conduct to be rude. It was part of the overall picture. If she really was just... What was the overall picture? Pardon me? But I mean, the charge was that she said I didn't work for that guy. Well, the charge, it wasn't separate charges. This was all one incident. Well, I know. If you have three separate specifications in a charge, right? Well, they weren't even broken out in specifications. Don't they look like it? They weren't separated out. This was one instance. What would happen if we found that one... Let's assume, for example, that we found one of the three take the first and we found there was no substantial evidence to support that. Wouldn't we have to vacate the decision and send it back? Well, I think you can't say that this conduct was so minor that it didn't justify anything. That's not our judgment. Doesn't our case law say that if you had specifications and one of them falls out and the agency hasn't made a showing in front of the board that they would have taken the same charges, you send it back? Well, I think his argument isn't necessarily substantial evidence. He's claiming that what happened wasn't sufficient enough to justify any penalty. He's made it clear that he doesn't think there's substantial evidence to say that saying to someone, I didn't work for you, that that equals misconduct. Right. But you can't just say, take one part of the charge out and then say, well, that doesn't arise to misconduct, so the rest can't arise to misconduct. My point is, how do I know that the agency would have taken the same action it did here if she had one of these events correctly charged against her, say, instead of three? Because his whole argument is that's so minor, she couldn't have been removed for that. You can't find on the one hand that that's so minor, she couldn't be removed for that, and then say, oh, but this other stuff is not significant either, a point stand alone. Not when the whole ball of wax is accumulated for you anyhow. The reason why they are removing her is not because of this offense. They're removing her because of, what, three actual grievances before and four recommended things? You're right, Your Honor. It's the cumulative effect. You have to look at the whole picture to see if it was sufficient enough to justify any penalty. I agree with you if there wasn't evidence that she said that to him, then you would have an issue of whether the rest would stand alone. But when you're making an argument that if she hadn't done that, there wouldn't be sufficient evidence, that wouldn't justify a charge. That completely conflicts with saying, on the other hand, that, well, let's remove that, and then the rest can't stand. You have to look at it as an integrated whole because that's what the agency did. So I think that that, in addition, shows that she wasn't just there trying to further the agency's interest. If she really was interested in just obtaining a state charge and not avoiding doing work, then why was she complaining about her co-workers pawning work off on her? And why did she try and get out of taking the call in the first place? I think there was testimony from Agent Dixon, her supervisor, that when you look at the whole picture, it was clear that she was trying to get out of performing work. And this was part of a practice that had happened in the past. I think, as you noted, the arbitrator had found that this instance, standing alone, wouldn't have justified removal. But it was the fact that this was her fifth time having been sanctioned for this. And I think that the other prior charges were substantially similar, in that they involved cases where she was trying to get out of performing work, or she was being rude and unprofessional. And I think that the agency certainly is entitled to find that part of her job was to maintain relations with these local law enforcement, and that her conduct at the airport undermined her ability to do that. So I do think that when you look at the four prior instances on top of what happened here, that would show that the penalty of removal was not totally unwarranted. Now, they are arguing in this case that the agency's claim that they didn't trust her is undermined by the fact that they had her, purportedly had her perform all of her duties. But the agency relied primarily on the lack of ability to be rehabilitated by Douglas Factor, not the lack of trust. And certainly, it's one thing for someone who knows that they're facing charges to be on their best behavior. But as Agent Dixon's conduct in the past has shown, once she's been sanctioned, she reverts back to her old ways. So I don't think that it was totally unwarranted for the agency to conclude that while she may have behaved while she was being charged, that doesn't show that she has a potential for rehabilitation. Totally unwarranted isn't really the standard, is it?  Really? Totally unwarranted is the standard, yes. We're asking whether substantial evidence supports something. I'm sorry. Totally unwarranted is on the penalty. What the agency did wasn't totally unwarranted. No, no. The substantial evidence is whether or not there was proof of the conduct. Then when you look at the penalty, the penalty, whether or not that was the appropriate penalty, is when you get into the totally unwarranted standard. I'm sorry if I was unclear on that point. So that is the last point I would like to make on the penalty issue, is that there wasn't evidence that she performed all of her functions. There was no evidence that they ever sent her back to Jacksonville Airport or that she interacted with Officer Spikes. In fact, her testimony... Just touch on one other thing. Your opposing counsel said it's the norm that border patrol agents are aggressive in their dealings with the public. I want you to discuss that. First of all, that is not the appropriate standard. They should not be overly aggressive. And in particular here, we're not dealing with her interaction with an alien in any event. This was her interaction with another law enforcement officer. Even if she were correct that they can be nasty to aliens, which the government's position is that's completely inappropriate, that won't even be relevant. She was being nasty to a local law enforcement agent that they rely on to take aliens into custody. So she shouldn't have treated him like that. It just strikes me as odd that arguments between the state and federal officials about who's supposed to do what kind of work... Hard for me to believe that that is misconduct. It probably happens every day. Constant argument back and forth. Whose job is it? Who's supposed to be doing this? That's contrary to Officer Spike's testimony. He testified that he never had anyone push him to make charges. And even if she were correct that it would be legitimate for her to say, can you put state charges on this guy? That's not all she did. She repeatedly kept pushing him, even after he had indicated he wasn't going to press charges. And it's important to note here that Officer Spike had already spoken with ICE and they had already determined that in this case, ICE was going to handle this case. It wasn't up to BPA Dixon to make that determination, particularly when Officer Spikes had decided a state arrest wasn't warranted and she and ICE had determined that ICE was the proper agency to process this already. So whether or not that debate may have been appropriate, that had already happened with ICE. She was just there to pick him up and take him into custody and start processing him. And she obviously didn't want to do that. And that damaged or potentially damaged the relations with the Jackson burial. If your honors have no further questions, I respectfully request that this court-affirmed decision be arbitrated. Thank you. Your Honor, if I could just briefly comment to a couple issues raised by my colleague. First off, if I did use the language, the norm to be aggressive, I certainly misspoke. I think a certain situation certainly can rise to that. What I did want to focus on was the comment of the cumulative effect of the prior disciplinary actions. That argument says is that she pretty much was converted to an at-will employee. That if someone perceived her as having a nasty attitude or just not being nice enough, she's fired. And there's the just cause. And I just can't see that as being the standard, because I think you're exactly correct, Your Honors,  especially out of the eyes of the public, can get heated as to how certain situations should resolve. And I think that's exactly what was happening here. And then if you parallel that to what her peer, Agent Mattesian, testified to. Was the record testimony relating to that? That conversations between law enforcement officers get heated? In order to keep your appendix as small as possible, I think I cited to the arbitrator's decision that's cited to the record. And I believe that starts on page 32 of the joint appendix. It's about four pages where it's discussed. But I think it starts at the bottom of 32. So if her conduct, because I do want to wrap up quickly, Your Honor, is that is parallel and the same as her peers, then how is that misconduct that can warrant the loss of her career? And then we look at the remaining two allegations in that specification of inappropriate conduct. All we have left is, I don't know that person, which is a very normal thing for someone to say. And is, well, it works being pond off on me, law enforcement officer to law enforcement officer. They're somewhat peers, even though they work for different governments, different agencies. That being said, we think there's ample reason here for the court to reverse this arbitrator's decision in order to reinstate it. Unless you have any further questions. I have further questions. I'm looking at 30, I looked at 32 through 35. And I don't, I see what I said to you, which is that the officer said he had never had that kind of experience before. But I don't see anything that says that it's the norm that police officers get into heated discussions about their work. I think I misunderstood what you were asking for, Your Honor. I thought you were asking about Agent Mattesian's testimony as to how he handled these situations with deputies in his area. In terms of impressing upon those deputies to impose state charges, just like Agent Dixon was doing here. I don't see any heated discussion in there. Well, you said that it was the norm. For a heated discussion? Yes, you did. I suppose it could rise to that. But if that's in the record, I don't think it's in the record. But it can certainly rise to that, I think, in terms of how things should resolve. But I don't think this conversation ever really got heated. I mean, from what Officer Spikes testified to, was that he said he felt uncomfortable. But nowhere in the specification do you see the word heated. Fine. Anything else? Thank you. Nothing, Your Honor. Thank you.